WILLIAM D. ALLOTT *et al.* Appellees, *vs.* THE AMERICAN STRAWBOARD COMPANY *et al.* Appellants.

*Opinion filed February 17, 1915—Rehearing denied April 7, 1915.*

1. EASEMENTS—*when water power becomes appurtenant to water lots.* Where parties construct dams on lands then owned by them as tenants in common, for the purpose of developing water power to be used upon water lots which they also own as tenants in common, and thereafter effect a voluntary partition by exchanging deeds allotting to certain of the water lots specific portions of the water and in addition thereto conveying to each grantee "one-half of all the remaining water in said mill-race," the

water power thus granted is not limited to the amounts specifically allotted to the particular water lots, but all water power not specifically allotted becomes appurtenant to the water lots conveyed by the deeds which have no specific allotment, and can only be severed therefrom by the owners thereof.

2. Same—*when water power rights appurtenant to water lots are not severed by deeds.*  Water power rights which have become appurtenant to water lots, after the construction of the dams, by an exchange of deeds between the tenants in common of the lands on which the dams were built and of the water lots, do not become severed from the water lots by subsequent deeds conveying lands in which the easement in favor of the water lots had been created and purporting to grant water power rights, where the conveyances of such lands have all included a portion of the water lots to which the water power rights were appurtenant.

3. Same—*when original easement of water power is enlarged.*  Where a navigation company, for a good consideration and with the consent of the owners of water lots, increases the height of the original dam, and, in consequence, the amount of water diverted to the water lots, the original easement is enlarged so as to entitle the owners of the water lots to have the dam maintained at its new height and to the unobstructed flow of the amount of water diverted thereby.

4. Same—*what does not show that the grantor treated water power rights as distinct from ownership of water lots.*  A provision in a deed conveying the grantor's interest in a certain water lot, which specifically limits the quantity of water to be used by the grantee, does not show that the grantor regarded the water power rights as distinct from the ownership of the water lots, where, at the time, the grantor owned the major portion of the water lots, and had, therefore, the right to apportion to any of such lots such portion as it saw fit of the amount of water power appurtenant to all of its lots.

5. Same—*when water power passes by conveyance of water lots.*  Where a grantor conveys all of the water lots owned by him, "with all water power privileges belonging, incident and appurtenant thereto," and without limiting the water power to be used in connection therewith, all the water power over which the grantor has control, either as owner of the water lots or as owner of the land on which the dam developing the power is located, passes to the grantee, in the absence of any contrary intention manifested in the deed.

Appeal from the Circuit Court of Will county; the Hon. Frank L. Hooper, Judge, presiding.

267 – 18

O'DONNELL, DONOVAN & BRAY, and CORLETT & CLARE, (J. L. O'DONNELL, and EDWARD CORLETT, of counsel,) for appellants.

P. C. HALEY, and R. E. HALEY, (E. C. HALL, of counsel,) for appellees.

Mr. JUSTICE COOKE delivered the opinion of the court:

William D. Allott and Jefferson D. Riley, the appellees, recovered a judgment for $37.61 against the American Strawboard Company, Benjamin Jackson and William Sharp, the appellants, in an action of trespass *quare clausum fregit* brought in the circuit court of Will county to the March, 1911, term thereof, and heard by the court without the intervention of a jury. From that judgment the defendants in the court below have prosecuted this appeal.

The *locus in quo* is described in the declaration as block 16 of Alden's Island addition to Wilmington, and out-lots 20 and 21 in H. O. Alden's subdivision of the north-west fractional quarter of section 36, in township 33, north, range 9, east of the third principal meridian, in Will county, Illinois, said real estate being riparian to the east channel of the Kankakee river. The alleged trespass consisted in the act of appellants in removing certain obstructions placed by appellee Allott during November, 1910, in the east channel of the Kankakee river between the east shore line of said block 16 and the west shore line of said out-lots 20 and 21.

The American Strawboard Company and the Illinois Valley Gas and Electric Company (the latter company being the employer of appellants Benjamin Jackson and William Sharp) are the owners of certain real estate along the east channel of the Kankakee river, which real estate is north of and down-stream from said block 16 and out-lots 20 and 21. Upon this real estate are located certain

manufacturing plants, which are operated by water power derived from the east channel of the river, and the owners thereof claim the right to the unobstructed flow of water into and through said east channel and into and through a certain mill-race connected therewith, which passes over and across their said premises. Appellees, however, claim that by reason of certain restrictions contained in the deeds through which the American Strawboard Company and the Illinois Valley Gas and Electric Company claim title, and by reason of certain rights conferred upon appellees by the deeds through which they claim title to said block 16 and out-lots 20 and 21, the American Strawboard Company and the Illinois Valley Gas and Electric Company are only entitled to use a specified and limited quantity of water in connection with their property, and that the obstructions placed in the east channel of the Kankakee river were for the purpose of reducing the quantity of water passing into and through said east channel and into and through the mill-race to the amount to which the owners of property through which said mill-race extends are, respectively, entitled under the deeds through which they claim title. The principal question presented to the trial court therefore was whether the appellees have the right to control and limit the flow of water through the east channel of the Kankakee river.

The premises involved in this suit are situated in the city of Wilmington, in Will county. The city of Wilmington is located on the east side of the Kankakee river, which flows past the city in a northerly direction. An island about a mile in length, known as Alden's island, and which is now a part of the city of Wilmington, divides the river into two branches, the one east of the island being referred to in the record as the east channel and the one west of the island as the west channel. The following diagram or map shows the relative location of the premises owned by the

respective parties and of certain dams, bridges and other
objects which will be referred to in this opinion:

In 1838 Thomas Cox, Joseph Cox and Albert W.
Bowen, while owning, as tenants in common, Alden's island
and all other lands riparian to the east channel of the river,

laid out into lots and platted a tract of land lying along the east side of the east channel of the river opposite the north part of Alden's island, calling the same "Water lots added to Wilmington." These lots were eleven in number, the most southerly being numbered 1, and the remaining lots, extending in a northerly direction from lot 1, being numbered consecutively to and including lot 11. Certain figures indicating the dimensions of each lot appeared on the plat, but the western boundary of each lot as shown on such plat is the east branch of the Kankakee river. In order to develop water power for use upon these lots, Thomas Cox, Joseph Cox and Albert W. Bowen, about the time the plat was made, constructed a dam from two and one-half to three and one-half feet in height across the west channel of the river, extending west from a point near the south end of Alden's island to the west shore line of the river, the purpose of this dam being to increase the flow of water in the east channel of the river. The location of this dam was the same as that of the dam designated on the above diagram as "Dam No. 3," which was constructed about 1870, as hereinafter noted. These parties also constructed a dam across the east channel immediately south of the south line of water lot 1 extended west, the location of this dam being at the place designated on the above diagram as "Baltimore street," the purpose of this dam being to create what is referred to in the record as a mill pond out of that portion of the east channel lying south of Baltimore street. They also constructed a mill-race running north from the mill pond across all of water lots added to Wilmington and terminating near the north line of water lot 11, at which place the water was conducted back to the east channel near the north end of Alden's island. This race has ever since supplied water power for the mills, factories and manufacturing plants which have been located on these water lots except such as have been located on water lot 1, which have always received water power di-

rectly from the mill pond through an opening under Baltimore street.

After completing the water power system in the manner above detailed, and on July 28, 1838, the co-tenants executed and interchanged deeds to these water lots. The deed from Thomas Cox and Joseph Cox conveyed to Albert W. Bowen all interest of the grantors in water lots 4, 5, 8, 9 and 11, "together with the privilege of drawing and letting off at all times 864 inches of water from the mill-race at said lot 11; also 72 inches of water from the mill-race at any place on the premises hereby conveyed; and after reserving 864 inches of water to be drawn from the said mill-race or mill pond at lot 1 of water lots and water sufficient to run a saw-mill and 72 inches of water to be drawn from said mill-race at lot 10 of said water lots, the one-half of all the remaining water in said mill-race." The deed also contained the following provision: "And the said parties of the first part, [being the grantors,] for themselves, their heirs, executors and administrators, do covenant, grant, bargain and agree to and with the said party of the second part and his heirs and assigns, * * * that no hindrance or obstruction shall ever be made or caused to be made by the said parties of the first part, their heirs and assigns, to the free admission of water into and passage of water through said mill-race or the flume or flumes which are or may be constructed therein; that the expense of making, repairing or building the said mill-race, mill dam or mill dams, head-gate or gates connected with the said water power, shall forever, after the date of these presents, be chargeable to and be paid by the said parties to these presents, their heirs and assigns, in proportion to the amount of water they, respectively, own." The deed from Albert W. Bowen conveyed to Thomas Cox and Joseph Cox all interest of the grantor in water lots 1, 2, 3, 6, 7 and 10, "with the privilege of drawing and letting off at all times 864 inches of water from the mill-race or mill

pond at lot 1 of said water lots, and water sufficient to run
a saw-mill and 72 inches of water from said mill-race at
said lot 10, after reserving 864 inches of water to be drawn
or let off from the said mill-race at lot 11 of said water
lots, and 72 inches of water to be drawn from the said mill-
race at any place on the premises owned by the said party
of the first part; also the one-half of all remaining water
in said mill-race." This deed also contained the same ad-
ditional provisions above quoted from the deed of Thomas
Cox and Joseph Cox to Albert W. Bowen. Thereafter, on
October 24, 1850, by *mesne* conveyances, one Hiram O.
Alden became the sole owner of all the real estate for-
merly owned by Thomas and Joseph Cox and Albert W.
Bowen except water lots 8 and 9 and the north part of
water lot 11, which were then owned by other persons claim-
ing title through Bowen. The deeds under which Alden
derived title expressly reserved to water lots 8 and 9 and
the north part of water lot 11 all water rights appurtenant
to those lots.

On October 20, 1853, Alden laid out and platted as an
addition to Wilmington a tract of land on the east side of
the east channel and named it "Alden's addition to Wil-
mington." The north line of this addition was about one-
half mile south of the water lots above mentioned. Out-lots
numbered from 16 to 22, inclusive, of this addition bor-
dered on the east channel, out-lots 20 and 21 lying across
the east channel from the southernmost part of Alden's
island. On October 28, 1862, Alden conveyed to Francis
O. J. Smith an undivided one-fourth interest in all prop-
erty of which he was the owner on October 24, 1850, and
this undivided interest by *mesne* conveyances passed to Wil-
liam Claflin on November 12, 1881. On October 13, 1865,
Alden laid out Alden's island into lots and blocks and plat-
ted the same as "Island addition to Wilmington." The
south end of the island, on which the eastern end of the
dam across the west channel was located, was designated

on the plat as block 16. This block was not subdivided into lots and was the only portion of the addition, except the streets therein, which extended to the shore line of the river.

In 1867 a stone-arch bridge, with head-gates on the up-stream side, was constructed over the mill-race at Baltimore street at the joint expense of the water lot owners and the city of Wilmington. All except thirty feet of the dam across the east channel at Baltimore street was then raised several feet in height, and across the thirty-foot space a wooden bridge was constructed. Up to this time the own-ers of the water lots had borne all expenses incident to re-pairing and re-building the dams and other portions of the water power system.

On October 6, 1869, Alden conveyed to the Kankakee Company his undivided three-fourths interest in all unsold lots and blocks in Alden's addition to Wilmington and in Island addition to Wilmington, and his undivided three-fourths interest in water lots 2, 3, 4, 5, 6, 7 and 10, "together with all the rights to unsold water power on sections 25 and 36," the same being the sections in which all the lands formerly owned by Thomas Cox, Joseph Cox and Albert W. Bowen were located. The Kankakee Company, the grantee in the deed from Alden, was the successor of the Kankakee and Iroquois Navigation Company, which was incorporated by an act of the legislature of this State passed February 15, 1847. The purposes and objects of the company as set forth in the act were, "the improvement of the navigation of the Kankakee and Iroquois rivers, the creation of water power on said streams, and the building and erecting mills and machinery of all kinds on and near said streams." (*People* v. *Improvement Co.* 103 Ill. 491.) On September 1, 1870, the Kankakee Company, in order to secure the payment of a large bond issue, conveyed to Edward Appleton and others, as trustees for the holders of such bonds, all real and personal property owned by it, together with all franchises and privileges, including all

rights of way, dams, locks, embankments, abutments, wing-walls, waste-weirs, head and lock-gates, guard-locks, and walls and canals, with all equipment upon or appurtenant to the line of canal and slack-water navigation in and upon the Kankakee river. This trust deed recited, among other things, that "it is the design and intention of said party of the first part [the Kankakee Company] to promote and encourage the occupation of the land and water power along the line of said navigation, now owned and created and to be created by the said corporation, by settlers and manufacturers," and made provision for the execution of deeds by the trustees when necessary to effectuate this intention. Thereafter the Kankakee Company entered upon the making of the improvements contemplated by its charter. It first sought to remove the dam extending across the west channel at the south end of the island and substitute therefor a dam six feet in height, but the remaining water lot owners protested against raising the dam to such a height, for the reason that the increased flow in the east channel would have flooded their buildings on the water lots. As a result of negotiations between these water lot owners and the Kankakee Company an agreement was reached whereby the Kankakee Company was permitted to re-build the dam across the west channel but was required to limit its height to five feet, and was further required to construct head-gates at the south end of the east channel and raise the west bank of the mill-race across the water lots. In accordance with this agreement, and in order to carry out the objects and purposes of the company, the Kankakee Company replaced the dam across the west channel with a dam five feet in height, which was thereafter known as dam No. 3 and is so designated on the above diagram. It also constructed a wooden bridge across the east sixty feet of the east channel at the south end thereof, the east abutment of which rested upon out-lots 20 and 21 of Alden's addition to Wilmington, which then belonged to the Kan-

kakee Company, and the west abutment of which was built out in the east channel a considerable distance from block 16 of Island addition to Wilmington, which block also then belonged to the Kankakee Company. That portion of the east channel between the west abutment of the bridge and said block 16 was then filled in so as to make a roadway from the island to the bridge. On the up-stream side of this bridge, and between the upright timbers thereof, gates were so constructed that a person standing on the bridge could raise or lower the gates with a wrench especially designed for this purpose, thus controlling the flow of water into and through the east channel. The Kankakee Company also constructed a lock at Baltimore street, on the west side of the east channel, and raised the dam east of the lock to a height of eighteen feet. Over this lock and on a level with the dam a bridge was constructed, and this dam and bridge have since served as a street leading from the island to that portion of the city located east of the river, the street being known as Baltimore street. The company at the same time deepened the east side of the east channel north of Baltimore street, this portion of the east channel being designated on the foregoing diagram as "Navigation Company's Canal." It also deepened the mill-race and raised the west bank thereof several feet, and built a substantial wall of considerable thickness along the east bank of the east channel, of suitable height for wharfage purposes by water lot owners.

On December 14, 1875, the Kankakee Company conveyed to S. E. Trott its undivided three-fourths interest in water lot 2, together with the right to draw from the mill-race "water to give power equal to thirty-five cubic feet of water per second, being equivalent to 30 horse power," and thereafter, on July 21, 1888, the undivided one-fourth interest in this lot formerly held by Francis O. J. Smith was also acquired by Trott. The title to water lot 2, together with the "right to draw 50 horse power of water from the

race," has since passed by *mesne* conveyances to the Illinois Valley Gas and Electric Company. Certain rules prescribed by the Kankakee Company were inserted in and made a part of the above mentioned deed to Trott, and the same rules were inserted in the subsequent deeds made by the trustees under the trust deed given by said company when said trustees thereafter executed deeds to water lots 6 and 7 and 3 and 10, as hereinafter set forth. Rule 4 was as follows: "The said grantee is not to use more water than is sold, nor unnecessarily waste it nor permit it to be wasted for want of repairs or through the deficiency of the works or otherwise, and if so wasted or more be used than is sold, the grantor may stop the water from entering the grantee's flume or flumes until such waste or excessive use be guarded against sufficiently, and to so stop said water from so entering the said flume or flumes the grantor may close the gate or gates across the same, and for the purpose of ascertaining the quantity of water used upon the above granted premises the said grantor shall have the right, from time to time, as it may desire, by its duly authorized agents, engineer or other officer, and with the necessary workmen and assistants, to enter upon said premises and to do all acts with as little injury as may be necessary or proper, for the measurements and ascertaining the quantity of water drawn as aforesaid."

In 1878 the trust deed given by the Kankakee Company was foreclosed and the property covered thereby was sold by the trustees under decree of court. On March 19, 1880, the trustees conveyed to the Kankakee River Improvement Company an undivided three-fourths of out-lot 21 in Alden's addition to Wilmington, and on April 8, 1880, conveyed to the same company an undivided three-fourths of out-lots 20 and 22 of the same addition and of block 16 in Island addition to Wilmington, and considerable property in the vicinity of dam No. 4, together with "all the corporate franchises and privileges, with the rights of way, dams,

locks, embankments, abutments, wing-walls, waste-weirs, head and lock-gates, guard-locks and walls and canals, with all the appurtenances thereunto belonging, the property of said Kankakee Company." Thereafter, on January 3, 1884, the trustees purported to convey to the "estate of Willis Phelps" an undivided three-fourths of water lots 6 and 7 and "sufficient water from the race in said city [Wilmington] to supply 150 horse power under a head and fall of ten feet," and on the same date the trustees conveyed to the Kankakee River Improvement Company an undivided three-fourths of water lots 3 and 10 and "sufficient water from the race in said city [Wilmington] to supply 75 horse power under a head and fall of ten feet."

On October 30, 1893, the Kankakee River Improvement Company conveyed to the Wilmington Water Power Company all property owned by the former company, "including all the land, dams, locks, canals, raceways and appliances, together with all rights, privileges and franchises in any way appertaining to or belonging to said grantor company." On January 22, 1896, the Wilmington Water Power Company conveyed to William Claflin, who, as hereinbefore shown, had previously acquired an undivided one-fourth interest in the property conveyed by this deed, "all lands and interest in land, flowage rights, dam rights, and any and all property, real and personal, of the said Wilmington Water Power Company situate or being in said Wilmington," and William Claflin thereupon became the sole owner of water lots 3, 4, 5, 6 and 7; out-lots 20 and 21 of Alden's addition to Wilmington and block 16 of Island addition to Wilmington, together with such flowage rights, dam rights, etc., as were held and enjoyed by the Wilmington Water Power Company as the successor of the Kankakee Company and the Kankakee River Improvement Company.

On May 31, 1898, Claflin conveyed to James W. Martin water lots 3, 4, 5, 6 and 7 and a part of water lot 1, "to-

gether with all the water power privileges belonging, incident and appurtenant to the interests in said lots hereby conveyed," and thereafter, on June 1, 1902, Claflin conveyed to appellee William Allott block 16 of Island addition to Wilmington and out-lots 20, 21 and 22 of Alden's addition to Wilmington and property in the vicinity of dam No. 4, together with "flowage rights, water power rights, dam rights, rights of way, and any and all other rights appurtenant to the lands above described;" and by a subsequent deed, dated July 17, 1902, Claflin conveyed to Allott "all lands and interests in land, flowage rights, dam rights, and any and all property, real, personal and mixed, of the said William Claflin situate in the county of Will."

The Illinois Valley Gas and Electric Company owns water lot 2, as hereinbefore shown, and has also by *mesne* conveyances become vested with the title to lot 1, upon which is located an electric light and power plant which is operated by water power, the water being received directly from the mill pond through an opening under Baltimore street. The appellant the American Strawboard Company has by *mesne* conveyances from Martin become vested with the title to water lots 3, 4, 5, 6 and 7, and by *mesne* conveyances from other parties who owned water lots 10 and 11, and water lot 9 except the north forty feet thereof, at the time of the above mentioned conveyance by Claflin to Martin, has also become vested with the title to water lots 10 and 11 and to said portion of water lot 9, together with all water power privileges appurtenant to said lots so owned by it. It also owns a gore of land immediately north of lot 11, extending to the Chicago and Alton right of way, upon which gore the water wheels furnishing power for its paper mill are located. While the mill-race as originally constructed extended only to the north line of water lot 11, it was in 1885 or 1886, by the then owner of water lot 11 and the gore of land immediately north thereof, extended north through said gore of land to furnish power

for the paper mill which was erected at that time on water lots 10 and 11 and said gore of land and on land lying east thereof.

Navigation of the Kankakee river was abandoned during the year 1885, since which time the water lot owners have kept dam No. 3 in repair, and have also since said time had possession of the wrench by which the head-gates at the south end of the east channel were raised or lowered, the evidence showing that these gates have never been used for the purpose of limiting the quantity of water flowing through the east channel, except during times of freshets and high water.

In 1892 the Wilmington Water Power Company conveyed to the city of Wilmington a right of way for public travel over and across the bridge at the south end of the east channel and over and across said block 16 and out-lots 20 and 21 from the bridge to streets of the city, and also conferred upon the city the perpetual right to maintain said bridge, reserving, however, all riparian rights. The city thereupon appropriated and expended $1000 in repairing the bridge and head-gates, and about seven years ago built an iron bridge upon the framework of the old bridge, the head-gates, however, being left in their original position.

In 1904 Allott shut down the gates at the south end of the east channel and locked them with padlocks. These locks were immediately removed by some of the water lot owners and the gates were raised. During the latter part of the year 1910 Allott, claiming the right to control the flow of water in the east channel, notified the American Strawboard Company that unless that company paid Allott for the water it was using from the mill-race in excess of that specified in the Cox and Bowen deeds he would prevent such excess from entering the east channel. Shortly afterwards, in November, 1910, Allott, following plans prepared by an engineer, closed part of the channel beneath the bridge at the south end of the east channel by spiking

planks to the uprights of the bridge to which the gates were attached, the planks extending from the bottom of the river to a line above the surface of the water. He also closed other parts of the channel beneath the bridge by placing boxes between the uprights and filling the boxes with broken stone and cement. The engineer who prepared the plans for placing these obstructions in the east channel testified that from the deeds in the chains of title to the water lots he estimated that the quantity of water to which all the water lots were entitled would develop but 85 horse power, and that the plans which he prepared for Allott provided for permanent obstructions at the south end of the east channel which would reduce the quantity of water entering the east channel so that it would develop 122 horse power. He further testified that before these obstructions were placed in the east channel the water used on lots 1 and 2 by the Illinois Valley Gas and Electric Company developed 546 horse power, and that used upon the property owned by the American Strawboard Company developed 684 horse power. It further appears from the evidence that it was not Allott's purpose to utilize this water for his own use, but to divert it into the west channel in order to deprive the water lot owners of a large portion of the water heretofore passing into the east channel and through the mill-race. Upon the removal by appellants of the obstructions above mentioned, Allott and Jefferson D. Riley, the latter having acquired from Allott an undivided one-half of the premises conveyed by Claflin to Allott, brought this suit. Appellee Riley sought to have it dismissed as to him, but Allott was allowed to use Riley's name as co-plaintiff, upon giving bond.

The questions of law presented upon this appeal were preserved for review by the propositions of law submitted by appellants which the court refused to hold as the law of the case. Appellees did not submit any propositions of law, and the theory upon which the trial court found the issues

in their favor does not, therefore, affirmatively appear from the record. Appellees, however, in support of the judgment of the trial court argue the case upon the theory that control over and ownership of the water power developed by means of dam No. 3, except a small portion thereof which they concede has become appurtenant to certain of the water lots, has at all times been kept separate and distinct from the ownership of the water lots and has never become appurtenant thereto. They contend that when Thomas and Joseph Cox and Albert W. Bowen, in 1838, constructed the water power system in controversy by placing dams across the east and west channels of the Kankakee river on lands then owned by them they thereby became the owners of the water power thus developed, and that during their ownership of such water power they allotted only a small portion thereof to certain of the water lots, the principal portion being subsequently granted by them to other persons as a property right separate and distinct from the ownership of water lots; that other persons and corporations succeeding to the ownership of this water power through *mesne* conveyances from the Coxes and Bowen have made further allotments of water power to certain other water lots, and that the ownership of all of said water power, except that so specifically allotted, and of all of the additional water power developed by reason of the increased height of the dam constructed by the Kankakee Company across the west channel in 1870, has by *mesne* conveyances from the Coxes and Bowen and from the Kankakee Company become vested in appellees. According to their theory water lot 11 is entitled to 864 inches of water by reason of the grant from Thomas and Joseph Cox to Albert W. Bowen; water lot 1 is entitled to 864 inches of water, and lot 10 to 72 inches of water, and water sufficient to run a saw-mill, by reason of the grant from Bowen to Thomas and Joseph Cox; water lot 9 is entitled to 72 inches of water, the same having been apportioned to that lot by Bowen when he con-

veyed a portion of the lot, in 1845; water lot 2 is entitled to water sufficient to develop 30 horse power by reason of the grant from the Kankakee Company to S. E. Trott, and appellees own and control the remainder of the water power by virtue of the grant from William Claflin to appellee Allott. In our judgment appellees' theory cannot be adopted for several reasons.

*First*—Appellees' argument in support of their theory necessarily assumes that the Coxes and Bowen did not, by their deeds of July 28, 1838, grant to each other, as water lot owners, all the power developed by the dams constructed by them. This assumption is unwarranted. Prior to July 28, 1838, the Coxes and Bowen constructed those dams on lands then owned by them as tenants in common, for the purpose of developing water power to be used upon the water lots which they also owned as tenants in common. After constructing the water power system they effected a voluntary partition of the water lots on July 28, 1838, by interchanging deeds. The right to use specific quantities of water from the head waters of the system in connection with certain of the water lots was granted to the respective parties, and in addition thereto each was granted "one-half of all the remaining water in said mill-race." The water power thus granted was not limited to that which could be developed by the inches of water specifically allotted to certain of the water lots, but included all the water in the mill-race, a portion, however, being granted to the Coxes as the owners of lots 1, 2, 3, 6, 7 and 10, collectively, and an equal portion to Bowen as the owner of lots 4, 5, 8, 9 and 11, collectively. The grant of water power in each of those deeds was made as an incident to the conveyance of the water lots, and the water power not specifically allotted to any particular lot, as well as that which was specifically allotted to particular lots, thereby became appurtenant to the water lots conveyed by such deeds and could only be severed therefrom by the owner thereof. That such was

267 – 19

the effect of these conveyances is clearly shown by the provision contained in each deed imposing upon the parties as water lot owners, their heirs and assigns, the duty of forever afterwards keeping in repair the water power system, the expense thereof to be apportioned in accordance with the amount of water owned by each. By these deeds an easement was created in the lands on which dam No. 3 was located and over and across which the diverted water passed to the mill-race in favor of the water lots, and such easement thereby became appurtenant to the water lots. The easement in the land on which dam No. 3 was located was the right to maintain that dam at the height to which it then extended, and the easement in the land over and across which the diverted water passed to the mill-race was the right to the unobstructed flow of water thus diverted by dam No. 3 into and through the east channel. We think it clearly appears from the provisions contained in the Cox and Bowen deeds, when considered in connection with the circumstances then surrounding the parties, that the Coxes and Bowen did grant to each other as water lot owners, and not otherwise, all the power developed by the dams constructed by them, and that their rights in the water power thus granted became appurtenant to the water lots owned by them, respectively.

The further question arises in this connection whether these parties, or their grantees, thereafter severed the easements thus created from the water lots to which they had been attached.

After interchanging the deeds to the water lots, and prior to May 6, 1845, the Coxes disposed of the north part of water lot 1 together with the right to draw 300 inches of water from the mill pond, and Bowen disposed of the south part of water lot 11 together with the right to draw 288 inches of water from the mill-race. After making these conveyances, and on May 6, 1845, the Coxes and Bowen again interchanged deeds, by which partition of the

island and of all lands riparian to the east channel, other than the eleven water lots, was effected, Bowen thereby becoming the owner of the land on which dam No. 3 was located. In making this partition each party reserved to himself "all rights and privileges to and of the water in the Kankakee river, and every part thereof," which he had at the time of making the deed. Thereafter the Coxes conveyed to James F. Alden, who in turn conveyed to Hiram O. Alden, all the lands to which the Coxes had obtained title in severalty under the partition deed of May 6, 1845, except a small tract on the east side of the east channel which they had previously conveyed to one Jeremiah Eastman, and by the same instrument conveyed water lots 2, 3, 6, 7 and 10 and the south part of water lot 1, "with all the privileges, and under all the restrictions and covenants," contained in the deed of July 28, 1838, from Bowen to the Coxes. On October 25, 1845, Bowen conveyed to Walter and Aaron Hitchcock the north part of water lot 9 together with 72 inches of water to be drawn from the mill-race, and on January 25, 1848, conveyed to Caroline F. Roberts all the lands to which he had obtained title in severalty under the partition deed of May 6, 1845, and water lots 4, 5 and 8, the south part of water lot 9 and the north part of water lot 11, and all right and title of the grantor "to the water power, or use of the same, at or in said town of Wilmington, upon sections 25 and 36, or any part thereof, whether owned by them or accruing to them, or either of them, as appurtenant to the lots or lands owned by them, or either of them, bounded upon the Kankakee river or otherwise, excepting or reserving the right to draw and use at all times 864 inches of water at lot 11 of said water lots added to Wilmington." On October 24, 1850, Caroline F. Roberts conveyed to Hiram O. Alden all real estate conveyed to her by Bowen, except water lot 8 and the north part of water lot 9, which she reserved. This deed also conveyed to Alden all the right and title of the grantor "to

the water power, and the use of the same, at or in said town of Wilmington or upon said sections Nos. 25 and 36, or any part thereof, whether owned by her or accruing to her as appurtenant to any lands owned by her, saving and excepting her rights, appurtenances to lots Nos. 8 and 9." Thereafter, in 1853, Caroline F. Roberts conveyed to William McIntosh the south part of water lot 8 together with 144 inches of water to be drawn from the mill-race, and subsequently conveyed to her son the north part of lot 8, "with all the water power belonging to the same," and the son, in turn, conveyed said north part of lot 8 to McIntosh, together with 288 inches of water to be drawn from the mill-race. Thereafter Caroline F. Roberts also conveyed to her son the north part of water lot 9, "and all of the water power, and use of the same, belonging thereto," and he, in turn, conveyed a portion thereof to David C. Thompson together with 72 inches of water to be drawn from the mill-race, and the remaining portion to M. D. Keeney together with "all water power, and the use of same, belonging to said lot, except that which has been conveyed to David C. Thompson and now owned by him." After the conveyances from James F. Alden and Caroline F. Roberts to Hiram O. Alden, the latter by *mesne* conveyances obtained title to the north part of water lot 1.

By the conveyances above mentioned Hiram O. Alden became the owner of the island in the Kankakee river and of all land appurtenant to the east channel, except the small tract which the Coxes had conveyed to Eastman and except water lots 8 and 9 and a part of water lot 11. Subsequently Alden conveyed a part of water lot 1, together with 864 inches of water to be drawn from the mill pond, to James F. Alden. On October 28, 1862, Hiram O. Alden conveyed to Francis O. J. Smith an undivided one-fourth interest in all real estate then owned by him in and about Wilmington, and on October 6, 1869, conveyed the remaining undivided three-fourths interest to the Kankakee Com-

pany, together with "all rights to unsold water power on sections 25 and 36."

It will thus be seen that up to and including the conveyance from Alden to the Kankakee Company, a portion of the water lots to which·no specific allotment of water or water power had been made at all times accompanied the conveyance of the lands in which the easement in favor of the water lots had been created by the Coxes and Bowen, and it therefore cannot be successfully contended that provisions in the respective deeds specifically mentioning water power as being thereby conveyed indicate any intention to sever the easement from the water lots conveyed by such deeds.

By the conveyance from Alden to the Kankakee Company the latter became vested with the title to an undivided three-fourths of the major portion of Alden's island, including block 16, on which the east portion of dam No. 3 was located; also of certain lands on the east side of the east channel, including out-lots 20 and 21 of Alden's addition to Wilmington, and of all water lots except those numbered 1, 8, 9 and 11, the remaining undivided one-fourth being then owned by Francis O. J. Smith, who, however, does not seem to have exercised any control over any of this property. Up to this time water lot owners who had been using water from the mill pond and mill-race had repaired dam No. 3 on numerous occasions and had rebuilt it on one occasion. The owners of the lands on which dam No. 3 was located, and over which the diverted water passed to the mill-race, had contributed nothing towards keeping the water power system in repair.

The primary purpose of the Kankakee Company was to improve the navigation of the Kankakee river by a system of locks and canals, for the use of which tolls were to be collected by the company. It was organized for the further purpose of developing water power and building and erecting mills on said river. In order to supply sufficient water

for the system of canals and locks it was necessary to construct dams at certain places along the river, the incidental result being the development of water power. A dam was thus required across the west channel at or near the site of the dam which then developed the water power for the water lots, in order to divert sufficient water into the east channel to permit of navigation therein, and another dam, known as dam No. 4, was required about one-half mile upstream from dam No. 3; in order to divert the water into a canal which it was necessary to construct for navigation purposes from a point a short distance south of dam No. 4 to the locks which were constructed near the south entrance to the east channel. While the primary purpose of the Kankakee Company in making changes in the flow of water in the river by the construction of dams was to permit of navigation, a secondary purpose was to develop water power for use upon such lands as might be adapted to use such power. The record shows that it sold water power developed by means of dam No. 4 for use upon lands in the vicinity of that dam, and some of the provisions in subsequent deeds with reference to water power rights evidently relate to the unsold water power developed by means of that dam. The company found water power already being developed by dam No. 3 for use on the water lots to which it had obtained title, as well as on water lots which were then owned by other persons. Dam No. 3, however, was not of a height sufficient to divert the quantity of water into the east channel necessary to permit of navigation therein. The company therefore sought to re-build and raise dam No. 3 to a height which would have flooded the buildings on certain of the water lots not owned by it and which would also have resulted in injury to the water lots which it owned. The other water lot owners protested against the action contemplated by the Kankakee Company, and thereupon an agreement was reached between the company and the other lot owners by which the company undertook to

construct a new dam five feet in height in lieu of the old dam, which at that time was, and had been since it was first constructed by the Coxes and Bowen, about two and one-half feet in height. The dam at Baltimore street and the mill-race had been constructed with a view of taking care of only so much water as would be diverted into the east channel by a dam two and one-half feet in height. In order to accommodate the additional flow of water which would be diverted into the east channel by a dam five feet in height and to prevent injury to the mill-race and water lots and the industries located thereon, the company was by the agreement required to increase the height of the dam at Baltimore street, enlarge the mill-race and strengthen the banks thereof, and place gates at the south end of the east channel in order to prevent an excess of water from entering the east channel. These changes were made by the Kankakee Company while it owned a portion of the water lots, under an agreement with the other water lot owners by which the company undertook to substitute new conditions for the development of water power in lieu of those theretofore existing, the consideration for such action on the part of the Kankakee Company, so far as the other water lot owners were concerned, being, that the company was permitted to construct a dam, in lieu of the dam which then existed, of sufficient height to permit of navigation in the east channel and incidentally to develop more power for use on the water lots owned by it. The effect of this agreement, and the action of the Kankakee Company thereunder, was to change the nature of the easement in favor of the water lots in the lands on which dam No. 3 was located and over and across which the diverted water passed to the mill-race, from a right to maintain a dam two and one-half feet in height across the west channel and to the unobstructed flow into and through the east channel of so much water as would be diverted by a dam of that height, to the right to maintain a dam five feet in height across the west

channel and to the unobstructed flow into and through the east channel of so much water as would be diverted by a dam of that height at all times except when it became necessary to limit the flow for navigation purposes. ·

On December 14, 1875, the Kankakee Company conveyed to S. E. Trott its undivided three-fourths interest in water lot 2 and the right to draw from the mill-race sufficient water to develop 30 horse power, a provision being inserted in the deed that the grantee should use no more water than was granted to him, and the company reserved the right to prevent water from entering the grantee's flume or flumes until the use of water in excess of that granted should be guarded against. This provision, however, does not indicate that the Kankakee Company treated the water power as a property right belonging to it separate and distinct from ownership of the water lots, as this grant of water power was made at a time when the grantor owned a major portion of the water lots and as such owner had the right to apportion the water power to which all the water lots owned by it were entitled, among those lots in such manner as it saw fit. The effect of this deed was merely to apportion to water lot 2 a specific portion of the water power to which all of the water lots then owned by the Kankakee Company were collectively entitled.

After the trust deed given by the Kankakee Company had been foreclosed the trustees conveyed to the Kankakee River Improvement Company an undivided three-fourths of out-lots 20 and 21 of Alden's addition and of block 16 of Island addition, together with "all the corporate franchises and privileges, with the rights of way, dams, locks, embankments, abutments, wing-walls, waste-weirs, head and lock-gates, guard-locks and walls and canals, with all the appurtenances thereunto belonging, the property of the said Kankakee Company." It would seem that had the ownership of water power developed by means of dam No. 3 become separated from the ownership of water lots it would

by this deed have passed to the Kankakee River Improvement Company. However, almost four years after the making of this deed, the trustees, in whom there remained only title to certain water lots, purported to convey to the "estate of Willis Phelps" an undivided three-fourths of water lots 6 and 7 and "sufficient water from the race in said city [Wilmington] to supply 150 horse power under a head and fall of ten feet," and on the same day conveyed to the Kankakee River Improvement Company an undivided three-fourths of water lots 3 and 10 and "sufficient water from the race in said city to supply 75 horse power under a head and fall of ten feet." Apparently neither the trustees under the trust deed given by the Kankakee Company, nor the Kankakee River Improvement Company, considered that the Kankakee River Improvement Company had by its former deed from the trustees become vested with the ownership of and control over the water power developed by means of dam No. 3 which had not been specifically allotted to water lots, otherwise this specific allotment of water to lots 3 and 10 was entirely unnecessary and superfluous. The only reasonable theory upon which this transaction can be explained is, that both the trustees and the Kankakee River Improvement Company recognized the fact that all water power which had not been specifically allotted to certain water lots was appurtenant to the water lots to which no specific allotment had been made, and that only the owner of such lots had a right to control the same.

Appellees call attention to the fact that the deed to the estate of Willis Phelps was void for want of a competent grantee, and that the allotment of water power to lots 6 and 7 was therefore ineffectual. This, however, is of no importance, as William Claflin thereafter, by *mesne* conveyances from the trustees under the trust deed and from the personal representatives of the estate of Willis Phelps, became vested with the title to water lots 6 and 7. Claflin also, by *mesne* conveyances from said trustees and from

Francis O. J. Smith, became vested with the title to water lots 3, 4 and 5 and a part of water lot 1, and by *mesne* conveyances from the Kankakee River Improvement Company and said Smith became vested with the title to block 16 of Island addition and out-lots 20 and 21 of Alden's addition, and all "flowage rights, dam rights, and all other property, real and personal," formerly belonging to the Kankakee River Improvement Company. On May 31, 1898, Claflin conveyed to James W. Martin water lots 3, 4, 5, 6 and 7 and a part of water lot 1, "together with all the water power privileges belonging, incident and appurtenant" thereto. Claflin did not reserve to himself any water power rights which were appurtenant to the water lots conveyed to Martin, but, on the contrary, conveyed those lots with all water power rights appurtenant thereto. Since this conveyance the persons holding title to block 16 of Island addition and out-lots 20 and 21 of Alden's addition, and to the dam rights, flowage rights and other rights mentioned in the trust deed given by the Kankakee Company, have never had title to any of the water lots.

We think it is significant that in every instance in which water or water power was specifically allotted to a particular lot, or in which control over the water power developed by means of dam No. 3 was otherwise exercised, it was the act of the person or corporation owning the water lots to which no specific allotment of water or power had been made, and it was not until there was a final and complete severance of the ownership of water lots from the ownership of lands on which dam No. 3 was located, which was accomplished by the conveyance from Claflin to Martin, that any attempt was made by anyone who had no title to water lots to exercise control over the water power system.

From a careful consideration of all the deeds under and through which the American Strawboard Company and the Illinois Valley Gas and Electric Company and appellees, respectively, claim title, and taking into consideration the cir-

cumstances under which the changes in the water power system were made by the Kankakee Company in 1870, it is our conclusion that the easements in the lands on which dam No. 3 is located and over and across which the diverted water passes to and into the east channel, which were substituted in 1870 by the Kankakee Company in lieu of the easements which were created by the Cox and Bowen deeds, in 1838, in favor of the water lots, have never been severed from the water lots, and that the water lot owners, and not the owners of block 16 of Island addition or of out-lots 20 and 21 of Alden's addition, have the right to control the flow of water diverted by dam No. 3 into and through the east channel to the mill-race.

*Second*—Appellees' theory is unsound for the following additional reasons: On May 31, 1898, as above noted, William Claflin, who was then the owner of water lots 3, 4, 5, 6 and 7 and part of water lot 1, as well as the lands on which dam No. 3 and the bridge at the south end of the east channel were located, and who had also succeeded to the flowage rights, dam rights and all other rights in the waters of the Kankakee river previously held and enjoyed by the Kankakee Company, conveyed all of the said water lots to James W. Martin, together with "all the water power privileges belonging, incident or appurtenant thereto." Dam No. 3 was then in position, the head-gates at the south end of the east channel were in place and were closed only in times of flood, the flow of water diverted by dam No. 3 into the east channel was unobstructed, and the flow of water into and through the mill-race was limited only by the capacity of the race. Notwithstanding the fact that the water lots were thus obviously situated with reference to the water power system, Claflin did not attempt to limit the water power which should accompany the conveyance of these lots, but granted all the water power privileges belonging, incident or appurtenant to those lots. Nav-

igation having long since been abandoned, the only visible purpose of maintaining dam No. 3 was to develop water power for the water lots. Therefore, when Claflin conveyed these lots without limiting the water power to be used in connection therewith, all the water power developed by dam No. 3 over which he had control, either as the owner of these water lots or as the owner of the land on which dam No. 3 was located or otherwise, passed to Martin as appurtenant to the water lots conveyed to him, and has by *mesne* conveyances of these water lots passed to and is now vested in the American Strawboard Company and the Illinois Valley Gas and Electric Company. This result necessarily follows from the principle of law which has been frequently applied by this court, that the conveyance of a thing imports a grant of it as it actually exists at the time the conveyance is made, unless a contrary intention is manifested in the grant. (*Feitler* v. *Dobbins,* 263 Ill. 78, and cases there cited.) It was not until after the conveyance of water lots to Martin that Claflin made the conveyance to Allott, by virtue of which appellees claim the right to obstruct and limit the flow of water into the east channel. As Claflin reserved no such right in his conveyance to Martin, it follows that no such right passed from Claflin to Allott.

As against water lot owners appellees have no right to interfere with the maintenance of dam No. 3 nor to obstruct the flow of water diverted by that dam into the east channel, and water lot owners have the right to peaceably remove obstructions placed in the east channel by appellees. (*Schmidt* v. *Brown,* 226 Ill. 590.) Appellees contend, however, that the water wheels of the American Strawboard Company are not located on any of the water lots, and that company, therefore, cannot justify its action in removing the obstructions on the ground that it was exercising its rights as a water lot owner. The American Strawboard

Company is the owner of water lots 3, 4, 5, 6, 7, 10 and 11 and a part of water lot 9, and as such owner has a clear right to the unobstructed flow of water into and through the east channel. Whether it is wrongfully using water from the mill-race is a question which does not concern appellees but can only be raised by another water lot owner. Neither does it concern appellees as to the proportion in which water lot owners are entitled to the water power developed by means of dam No. 3.

It is apparent that the trial court did not apply the correct rules of law in the decision of this case. The judgment of the circuit court is therefore reversed and the cause is remanded for further proceedings consistent with the views herein expressed.       *Reversed and remanded.*